# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CHRIS WILLIAMS | : | |
| Plaintiff, | : | |
| | | Case No. 3:08cv00168 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. INTRODUCTION

Plaintiff Chris Williams filed an application with the Social Security Administration asserting he was eligible to receive Disability Insurance Benefits (DIB) because his health problems prevented him from working and therefore constituted "disability" within the meaning of the Social Security Act.

At each stage of administrative review, the Social Security Administration denied Plaintiff's DIB application. The most significant denial for purposes of the present case occurred in the decision of Administrative Law Judge (ALJ) Thaddeus J. Armstead Sr., who held a hearing, reviewed the evidence of record, and concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act. (Tr. 16-26). ALJ Armstead's non-disability decision is subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

#8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and granting benefits, or at a minimum, remanding this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.   BACKGROUND

Through his DIB application Plaintiff claimed that he was under a disability beginning on December 1, 2003. (Tr. 59). He met the earnings requirement for DIB eligibility through March 31, 2007. (Tr. 18). Consequently, the main issue Plaintiff presented to the Social Security Administration is whether he was under a disability beginning on December 1, 2003 through March 31, 2007.

Plaintiff was 41 years old on his alleged disability onset date. He was 44 years old on the date his DIB eligibility expired. He is thus considered an "younger person" for purposes of resolving his DIB claim. *See* 20 C.F.R. §404.1563(e); *see also* Tr. 24, 87.

Plaintiff has a high-school education and two years of college. (Tr. 65). He has worked as a factory machine operator. (Tr. 60, 68).

During the ALJ's hearing, Plaintiff testified that he has not worked full time since December 2001. (Tr. 349). He was a stay at home parent until he "got hit with the divorce." *Id.*

Plaintiff described his history of multiple surgeries, leaving him in severe pain in his lower back, neck, shoulders, left leg and right knee. (Tr. 350-56). He underwent back surgery in 1992, left foot and left shoulder surgery in 1994, right knee surgery in 1995, right shoulder surgery in 2000, and L4-5 surgery in 2002. During the hearing, he reported he was scheduled for another right knee surgery in February 2007. He testified for example:

> [M]y back just kept deteriorating worse and worse and I was having trouble with my upper neck, too, but my lower back was just shooting down

> the left side and they took part of the disk out on the left side. The first time
> it went down the left side and they took part of the disk out on the left side.
> The second time it ruptured out the right side and they took part of it out.
> And then the third one, those two vertebras had compressed and then the
> one underneath it was compressing and they said they had to do all three,
> fuse them, put rods in.

(Tr. 352). Plaintiff testified that his back pain is "gradually getting worse and it's starting to go down my left side every day, every minute of every day." (Tr. 356).

Plaintiff also testified that he cannot sit for long without having to stand, and he cannot stand for long without needing to sit. He noted, "Sometimes I go over and try to do the dishes and I have to go sit back down." (Tr. 357). He has also had difficulty using his hands for 10 years. (Tr. 365). He reported extreme pain and difficulty with taking a lid off a jar, writing, or wringing out a washcloth. (Tr. 365-66).

Plaintiff relies heavily on the report and opinions of his long-term treating physician David Page, M.D. (Tr. 274-90). Dr. Page reported in July 2006 that Plaintiff had been a patient in his practice for over ten years. Dr. Page then wrote:

> Patient has multiple medical problems and chronic pain conditions, requiring several different medications. Patient is on Cozaar to control hypertension, and Zocor for hyperlipidemia.
>
> He has chronic lower back pain exacerbated by most activities, particularly lifting and bending for several years. Patient has had 3 different operations the first one was in 1992, at the L4-5 level of the left side by Dr. Bernstein. In 2002 at the L4-5 level on the right side by Dr. Poelstra. And EMG on 9/30/2004 showed chronic L-5 radiculopathy. Patient underwent a third surgery by Dr. Amongero in October 2005 for L4-5, L5-S1 decompression, but unfortunately continues to have ongoing lower back pain. Patient has difficulty tolerating non-steroidal medications secondary to GERD and GI symptoms and is encouraged to use Tylenol for pain control.
>
> Patient has also had bi-lateral shoulder surgeries over the last couple of years and remains in chronic pain from the shoulders, the right one being worse than the left one. Patient recently has had an MRI performed on the right shoulder and has a follow up with Dr. Nitz to decide on further action.

> Patient also has multiple joint aches in all extremities and is currently awaiting a Rhuematoid work-up from a specialist.
>
> Patient does suffer from chronic depression and anxiety over several years and is currently controlled with Effexor and recently was tried on Rozerem to help with his insomnia. Depression and anxiety does worsen with the chronic pain that he is in and also the chronic pain will worsen depression and anxiety....
>
> Patient also suffers from chronic neck pain. An MRI on 2/10/2005 showed degenerative changes at C4-5, 5-6, 6-7. His pain is exacerbated by various activities and varies in intensity from day to day.
>
> Patient had a repair of the ACL of his right knee in 1995 by Dr. Manarino and continues to have chronic pain. Since then has seen Dr. Manarino off and on over the past 10 years.
>
> Patient also has various degrees of arm and hand pain over the last couple of years and has been diagnosed with carpal tunnel syndrome....
>
> I feel that the above patient's complaints and chronic pain are reasonable and supported from his multiple surgeries that have been needed and the positive findings on a variety of ... tests as mentioned above. Mr. Williams lives in chronic pain at multiple sites and has tried to work. He has been unable to work since December 2003, due to increase in lower back pain particularly with activity and also aggravated by his depression and anxiety.
>
> I feel that patient would not be able to work even a sedentary job of any sort due to his chronic pain that he lives with and this would disturb his concentration and be unable to work any regular scheduled hours.

(Tr. 274-75).

In a form Dr. Page completed, he further opined as follows: Plaintiff could lift and carry only 5 pounds occasionally and no amount of weight frequently; he could not stand or walk more than 30 to 60 minutes total in an eight-hour workday and no more than 5 to 10 minutes at a time; he could only sit for 4 hours total during an 8 hour workday and for no more than 30 to 60 minutes without interruption. (Tr. 276-77). Dr. Page also reported that Plaintiff's chronic back pain prevented him from climbing, balancing, stooping,

4

crouching, kneeling, or crawling during a workday. (Tr. 278). Dr. Page believed that Plaintiff would be absent more than three times a month due to his impairments or treatments. (Tr. 280). And Dr. Page concluded that Plaintiff would not be able to work a sedentary or light exertional job. (Tr. 280; *see* Tr. 281-90).

Plaintiff also relies on the MRI report of his right knee taken December 22, 2006 and treating surgeon, Frank P. Mannarino, M.D.'s treatment note from December 28, 2006 in which Dr. Mannarino's notes that the MRI showed postsurgical changes – a lateral meniscus tear as well as chondromalacia. (Tr. 311-13).

The Commissioner relies on the treatment notes of Plaintiff's orthopedic surgeons, Paul A. Nitz, M.D. and Marcos E. Amongero, M.D., to support the ALJ's finding. Dr. Nitz first saw Plaintiff on August 16, 2000. He felt Plaintiff's examination findings were consistent with a rotator cuff tendinopathy with acromioclavicular joint arthropathy. He recommended shoulder exercises and anti-inflammatories. (Tr. 262). Dr. Nitz recommended surgery after the medication and exercises did not resolve Plaintiff's pain. (Tr. 260). A right shoulder arthroscopic labral debridement with arthroscopic rotator cuff decompression and arthroscopic lateral clavicle resection was performed December 22, 2000. (Tr. 259). Dr. Nitz released Plaintiff to return to work in February 2001. (Tr. 257).

In February 2005 Plaintiff saw Dr. Nitz for right shoulder pain. (Tr. 249). Physical examination showed no atrophy, full passive range of motion, tenderness, and equal manual muscle testing; Plaintiff was assessed with possible rotator cuff impingement or tear, and tendonopathy. *Id.* Dr. Nitz performed right shoulder arthroscopic debridement and repair on May 26, 2005. (Tr. 245, 248).

In July 2005 Dr. Amongero reported Plaintiff had poor range of motion, his gait and posture were unremarkable, sensation and reflexes were normal, and straight leg raising was negative. (Tr. 241). An MRI taken in August 2005 showed complete disc loss at L4-5 secondary to multiple surgeries at this level, along with fairly advanced

5

degenerative changes at L5-S1 and facet hypertrophy at L5-S1. (Tr. 240). Dr. Amongero performed Plaintiff's posterior lateral fusion at L4-5 and L5-S1 on October 31, 2005. (Tr. 239). In November 2005 Dr. Amongero noted Plaintiff was "doing well" and had not taken any pain medication "for the last week." (Tr. 238). In January 2006, Plaintiff principally complained of stress in connection with his divorce, and a breast mass that was discovered. (Tr. 237). He reported "a moderate degree of back pain and left leg symptoms" but he had "not been wearing his brace." (Tr. 237). In February 2006, Plaintiff was doing well, with "no significant low back or lower extremity symptoms." (Tr. 236). In May 2006, Dr. Amongero reported that Plaintiff was stable, and he "can resume normal activities." (Tr. 235).

Plaintiff was examined by state agency physician, Christopher Wright, M.D. in July 2004. Dr. Wright reported that Plaintiff walked with a normal gait. Examination revealed normal cervical spine range of motion, well preserved muscle strength and sensation, mildly decreased grip strength, no evidence of muscle atrophy, normal bending at the waist, no muscle spasm, and no evidence of muscle weakness or atrophy. He also had normal knee flexion, significant crepitus in both knees, but normal range of motion and strength. Dr. Wright diagnosed chronic back pain, right knee pain status post remote ACL reconstruction, with a history of bilateral shoulder surgery for impingement syndrome and carpal tunnel syndrome bilaterally. Dr. Wright opined Plaintiff could perform a moderate amount each of the following: sit, stand, walk, bend, kneel, push, pull, and lift and carry heavy objects. Dr. Wright concluded Plaintiff had no limitations with reaching, grasping, or handling. (Tr. 128-35).

W. Jerry McCloud reviewed the record for the Ohio Bureau of Disability Determinations on July 28, 2004 and concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could sit, stand, or walk for six hours each; could occasionally kneel and crawl; and had no manipulative limitations to perform light work exertionally. (Tr. 194-99). Dr. Villanueva agreed with these opinions. (Tr. 198).

6

## III. THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or

equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity,[2] can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## IV. THE ALJ's DECISION

The ALJ's most significant conclusions for purposes of the present case occurred at Steps 2 and 4 of his sequential evaluation.

At Step 2 the ALJ concluded that Plaintiff "has the following severe combination of impairments: remote anterior cruciate ligament (ACL) reconstruction, chronic back pain, history of bilateral shoulder surgery for impingement syndrome, bilateral carpal tunnel syndrome (CTS), meniscus tear and chondromalacia; right side (CTS)." (Tr. 18).

At Step 4 the ALJ found:

> [T]he claimant has the residual functional capacity to occasionally lift [twenty] pounds and frequently lift ten pounds; to stand and walk in combination for about six hours in an eight hour workday; to sit for at least six hours in an eight hour workday with sit/stand option at will and no prolonged walking; no climbing ladders, ropes, or scaffolding; and no use of foot pedals with the lower extremities; all other postural requirements are occasional; occasionally perform overhead reaching bilaterally of upper extremities with occasional strenuous gripping/bilaterally (i.e., the strength needed to forcefully squeeze and hold while turning a wrench or a screw driver); and frequently perform fine manipulation, but not repetitively.

---

[2] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

8

(Tr. 19). This assessment, along with the ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and hence not eligible for DIB. (Tr. 25).

## V. JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Secretary of Health and Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994). And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

9

## VI. DISCUSSION

Plaintiff argues mainly that the ALJ erred by ignoring the opinions of his treating physician Dr. Page and by not articulating any reasons why he did not credit Dr. Page's opinions.

Social Security Regulations require ALJs to evaluate every medical opinion of record regardless of its source. *See* 20 C.F.R. §404.1527(d). The required evaluation first focuses on treating physicians or psychologists, whose opinions are entitled to controlling weight under the treating physician rule as long as they are (1) well supported by medically acceptable data and (2) not inconsistent with other substantial evidence of record. 20 C.F.R. §404.1527(d)(2); *see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004). When these requirements are not met, the treating physician rule does not apply. *Id*.

Once the ALJ has concluded that the treating physician rule does not apply to a particular treating source's opinion, the evaluation has only just begun. The ALJ must continue to evaluate the treating source's opinion by considering several additional factors, specifically the nature and extent of the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization, if any, of the treating source; and other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(d)(2)-(6); *see Wilson*, 378 F.3d at 544.

As to non-treating medical sources – such as one-time examiners or medical experts who testify during the administrative hearing – ALJs must evaluate their opinions under the same regulatory factors applicable to treating medical sources – supportability, consistency, specialization, *etc*. *See* 20 C.F.R. §§404.1527(d), (f).

As discussed above, *supra*, §II, Dr. Page was Plaintiff's long-term treating physician. Dr. Page's detailed assessment of Plaintiff's work abilities found him as able to perform only limited range of sedentary work. (Tr. 274-290).

The ALJ briefly mentioned Dr. Page's opinion at Step 2 of the sequential

evaluation by listing Plaintiff's conditions. (Tr. 18). The ALJ also briefly listed Plaintiff's history of multiple surgeries and certain diagnoses by Drs. Wright and Braunlin. *Id*. Based on this evidence, the ALJ identified several severe impairments at Step 2. *Id*; *see supra*, §IV. Significantly, however, the ALJ at Step 2 did not weigh or discuss Dr. Page's opinion about Plaintiff's work abilities and limitations. *See* Tr. 18-19. The ALJ likewise omitted any discussion of Dr. Page's opinions about Plaintiff's work abilities and limitations at Steps 3 and 4 of his sequential evaluation. *See* Tr. 19-24. And the ALJ, contrary to Dr. Page's opinions, concluded that Plaintiff could perform a limited range of light exertional work. *Id*.

By overlooking or ignoring Dr. Page's opinions about Plaitniff's work abilities and limitations, the ALJ committed an error of law. *See Bowen*, 478 F.3d at 746-47; *see also Wilson*, 378 F.3d at 544-45.

The Commissioner maintains that even though the ALJ did not articulate his reasons for rejecting Dr. Page's extreme opinion, he plainly rejected it by finding Plaintiff less limited than Dr. Page claimed. This contention at most attempts to show that the ALJ did not ignore or overlook Dr. Page's opinions about Plaintiff's work abilities and limitations. The ALJ's decision itself belies this contention because the ALJ did not describe Dr. Page's opinions about Plaintiff's work abilities and the ALJ did not provide any explanation of why he rejected Dr. Page's opinions about Plaintiff's work abilities and limitations. The ALJ's decision mentions Dr. Page only two times. *See* Tr. 18-25. Neither mention of Dr. Page discussed his opinions about Plaintiff's work abilities and limitations. And the ALJ at no point provided "good reasons" for rejecting Dr. Page's opinions, in contrast to the mandatory procedural requirements of the Regulations. *See* 28 C.F.R. §404.1527(d)(2); *see also Wilson*, 378 F.3d at 544-45. "[B]ecause §1527(d)(2) provided claimants with an 'important procedural safeguard,' the SSI was not free to relax or disregard the rule in an ad hoc fashion." *Bowen*, 478 F.3d at 747 (quoting in part *Wilson*, 378 F.3d at 547).

11

The Commissioner further contends that, unlike Dr. Page, none of the specialist physicians who actually treated Plaintiff for his purportedly disabling conditions suggested he was as limited as Dr. Page believed. And the Commissioner contends that the ALJ's assessment of Plaintiff's Residual Functional Capacity was based on substantial evidence, certain medical records and the opinions of Drs. Amongero and Nitz, upon whom the ALJ properly relied. These contentions miss the mark because they do not directly refute the ALJ's error of law. Instead, the Commissioner's arguments at most attempt to show that the ALJ's error was harmless due to the presence of other medical evidence and medical source opinions in the administrative record.

It is highly doubtful that the Commissioner's *post-hoc* rationalizations can be the sole basis to affirm an ALJ's decision when the ALJ has failed to weigh a treating medical source opinion as required by the Regulations. As *Wilson* explains:

> A court cannot excuse the denial of a mandatory procedural requirement protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because the [aggrieved party] appear to have had little chance of success on the merits anyway.' To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with §1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without observance of procedure required by law.'

*Wilson*, 378 F.3d at 546 (internal citations omitted). Although the Sixth Circuit has left open the issue of whether a *de minimis* violation of the procedural requirements of §404.1527(d)(2) can constitute harmless error, a review of Dr. Page's letter, the forms he completed, the evidence on which he relied, and the reasons he provided in support of his opinions, *see* Tr. 274-90, does not reveal that his disability opinion "is so patently deficient that the Commissioner could not possibly credit it...." *Wilson*, 378 F.3d at 547.

12

Accordingly, Plaintiff's challenges to the ALJ's evaluation of Dr. Page's opinions are well taken.

## VII.   REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems identified above. On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) determine anew whether Plaintiff was under a disability and thus eligible for DIB during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

**IT IS THEREFORE RECOMMENDED THAT:**

1.   The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Chris Williams was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.


June 25, 2009                                       s/ Sharon L. Ovington
                                                  Sharon L. Ovington
                                              United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).